**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-xxxx |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, JOHN DOE ("Plaintiff" or "John"), by and through his undersigned counsel, GIANNA R. SCATCHELL, ESQ. OF DISPARTI LAW GROUP, P.A., complains as follows against Defendant, NORTHWESTERN UNIVERSITY ("Defendant" or "NU"):

## INTRODUCTION

1. This case centers on a chain of events that began on September 25, 2021, and the actions taken and procedures employed by NU that involved Plaintiff, John Doe, and Jane Roe who were both students at NU-Qatar. John accused Jane of trying to set his hair on fire by waving a lighter flame around his face and hair. When Jane refused to heed his requests to stop, John physically removed the lighter from her hands. Nine days later, a person who did not witness the incident filed a report accusing John of physically assaulting Jane on September 25th. John was immediately placed on an interim suspension and then suspended for another semester.

2. Universities like NU face few harder tasks than investigating accusations that one student physically assaulted another student or responding to a student experiencing a mental health crisis. This case involves both. The paramount challenge for NU in either situation is to assess whether the student poses a danger to himself or other members of the school community. If imminent harm is likely, NU can place the student on an interim suspension. But these

1

disruptive and intrusive measures must be carried out in a manner that respects the accused student's rights, including those under federal civil rights laws.

3. International students in either scenario face additional hardships during the disciplinary process including cultural construct differences, time zone differences, and language barriers. Even for students who are fluent in English, sometimes words and phrases carry underlying meanings that international students may not immediately grasp.

4. NU dismissed the fact that John is an international student and provided him no translator, failed to take into account the large time zone difference, and failed to account for differences in cultural constructs.

5. NU further railroaded John to find him guilty of being "a threat to himself or others" regardless of the lack of evidence or merit in the allegations because of its gender bias against accused male students, John's disability, and because of NU's financial interest.

6. As such, John has sustained tremendous damages to his future education, career prospects, and reputation because of NU's decision and sanction. John seeks damages and declaratory relief from NU's unlawful actions, which resulted in John's nearly year-long suspension.

## JURISDICTION, VENUE, AND PARTIES

7. Federal jurisdiction arises under federal question jurisdiction (28 U.S.C. § 1331).

8. Venue is proper because Defendant is engaged in a business in this District, and a substantial part of the alleged events or omissions giving rise to the claims occurred in this District.

9. Plaintiff, John Doe[1], at all relevant times, was a full-time undergraduate student at NU Qatar.

---

[1] Contemporaneously with the filing of this Complaint, John filed a Motion for Permission to Proceed Under Pseudonym as "John Doe" given the sensitive and private nature of the matters alleged herein. He also seeks permission to refer to the female complainant in the underlying student disciplinary proceeding as "Jane Roe."

10. NU, is a private undergraduate and postgraduate school and is covered by the ADA as a "place of public accommodation" (42 U.S.C. §12181(7)(j)), Rehabilitation Act, and Title IX.

11. At all relevant times, NU operated a satellite campus in Education City, Qatar.

## FACTUAL ALLEGATIONS

### John's Background and Experience at Northwestern

12. John is a Chinese citizen from Chongqing, China. He began coursework at NU Qatar in the fall of 2018 in the study of pre-law Journalism and Strategic Communications.

13. During his time at NU, John excelled academically. He achieved a 4.00 GPA and received a competitive scholarship for academic achievement from the Qatar Foundation.

14. Upon John's acceptance into NU, NU provided him with copies of its Student Handbook.

15. NU claims jurisdiction over all cases that may call for discipline of a current student arising out of conduct that occurs off-campus when "the conduct has a real and substantial connection to the legitimate interests of NU or members of NU community" even if that incident occurs off-campus, outside of school hours, or outside of the United States.

### Prohibited Conduct

16. NU's 2021-2022 Handbook prohibited students from engaging in any action or threat of action "that endangers or threaten[s] to endanger the health, safety, or well-being of any person (including oneself)."

17. The Handbook further prohibits "[d]emeaning, intimidating, threatening, or violent behaviors that affect the ability to learn, work, or live in NU environment depart from the standard for civility and respect."

18. The Handbook sets forth the procedures by which students who have been accused of violating one or more of the enumerated policies are investigated, heard, and disciplined.

19. The Handbook specifies that students accused of misconduct shall expect a fair and impartial disciplinary process where NU must show by a preponderance of the evidence that Handbook policy was violated.

20. The Handbook provides the following rights to any student involved in the disciplinary process: right to fair treatment; right to privacy; right to written notice; right to a hearing; right to an advisor; and right to an appeal.

21. Any person may file a complaint with the Office of Student Conduct, including NU, who reserves the right to initiate a complaint, serve as the complainant, and initiate conduct proceedings, without a formal complaint made by the alleged victim.

22. Once a complaint is received, NU also retains the right to proceed with the disciplinary process, even if a complainant chooses not to participate. However, disciplinary action should only be taken without a complainant's consent if such action is deemed necessary to protect the safety, security, and/or integrity of the University and/or its members.

**Interim Restrictions**

23. Interim measures may only be imposed on an emergency basis when necessary to protect the safety, security, Complainant, University, or members of the community from an "immediate threat" and only after NU conducts an "individualized safety and risk analysis" that reveals the person of concern poses "an immediate threat to the physical health or safety of any student or other individual arising from the allegations [to] justif[y] removal."

24. Any emergency removal of a student will also involve consultation with the Behavioral Consultation Team and the Division of Student Affairs.

25. NU provides a Respondent with notice and an opportunity to challenge the interim removal decision.

### NU's School Safety Protocol

**26.** Northwestern's Behavioral Consultation Team ("NUBCT") considers various fact-based considerations to guide its threat assessment inquiries of persons of concern for harmful or violent behavior to determine whether a person of concern is on the path toward or away from harmful or violent behavior.

**27.** According to the Handbook, NUBCT uses its discretion to assess if a "person of concern" needs managed assistance, medical treatment, or intervention as outlined in Diagram 2:



Diagram 2: NU Behavioral Consultation Team Management Flowchart*

*This flowchart reflects only a general framework to guide team process. This process is subject to change depending on the circumstances of a specific case.

Page 37

**28.** Management plans are interventions for persons of concern who the BCT team determines pose a threat.

**29.** According to NU, the threat assessment is based on an individual's observed conduct, actions, and statements, not mere knowledge, or belief that the individual has a disability.

30. NU promises that "[a]n individual with a disability will not be subjected to an adverse action based on unfounded fears, prejudice, and stereotypes."

31. Assistance plans are interventions designed for persons of concern who are believed not to pose a threat but may need to be connected to appropriate services including mental health services, crisis management, and comprehensive services for victims.

32. A Priority 1 (Imminent Risk) level means that the person appears to pose a clear and immediate threat of serious violence toward self or others and requires containment. NU staff are directed to immediately notify law enforcement to pursue containment options, and/or take actions to protect identified target(s) and monitor the situation in such circumstances.

### NU's Complaint and Resolution Process

33. The student conduct process begins when the Office of Community Standards ("OCS") receives a report or a referral about a student(s)' conduct.

34. Once a complaint has been filed, it shall be resolved in one of the following ways: (i) case closed (no basis for the complaint); (ii) informal resolution (formal resolution is not desired by the Complainant or insufficient information to proceed with a formal investigation); (iii) further investigation (complaint is substantive but lacks information to hear the complaint); (iv) deferred prosecution (contingent on the student satisfying certain conditions); (v) summary resolution (exigent circumstances require immediate action to protect the welfare and safety of the NU community); or (vi) the complaint is referred to a formal hearing.

35. Disciplinary matters are handled by Defendant's administrators in Evanston, Illinois.

36. OCS assigns a student conduct administrator to gather information and determine the appropriate means of resolution, including meeting with the reporter and other witnesses.

37. At least three days before the initial investigative meeting, a respondent will be notified of a brief description of the alleged misconduct, (e.g. time, date, and place), a list of any NU policies allegedly violated, and the steps toward resolution.

38. The NU investigators conduct interviews, offer written summaries, and allow the complainant and the respondent to respond, identify witnesses, documents, and other evidence, propose witness questions, and supply responsive statements.

39. The investigators then write a preliminary report including the information provided by the reporter, the respondent, each witness, and either a copy or written summary of all relevant evidence collected during the investigation. The preliminary report will not contain any findings. Respondent can review the preliminary report and respond to it.

40. After completing the investigation, the Investigators weigh the evidence to determine whether it was more likely than not that the respondent was responsible for the misconduct alleged. If the Investigators found the respondent responsible, a determination will be made that the Handbook had been "violated," and a report is prepared.

41. The next stage, the Administrative Hearing stage, is structured as a so-called "private conversation" between a respondent and a Case Resolution Coordinator.

42. If the alleged violation(s) may result in separation from NU, the matter will be investigated and resolved by two investigators and sanctions will be assigned by a Sanctioning Panel.

43. Panel members of the Sanctioning Committee are comprised of three members including NU students, faculty, and staff. Panel members apply annually and are selected by OCS.

44. Respondents and reporters receive a list of all potential sanctioning and appellate panel members before the Sanctioning Panel to check for any conflicts of interest or material bias.

45. A Respondent can independently speak to the panel for 10 minutes to provide input toward sanctioning. The panel may then ask questions of the respondent.

46. Within seven (7) calendar days, the Sanctioning Panel notifies the respondent of the outcome of the decision including the sanctions, rationale, and information about the appeal process.

## The Events of September 25, 2021

47. Approximately four years ago, John, Jane Roe ("Jane"), Diya, and Ena met at NU and quickly became friends as first-year undergraduate students who bonded over their experience as international students dealing with the rigors of their respective undergraduate school curriculum while living far away from home.

48. Over the years, the four students studied together, traveled together, visited each other's families, and even visited or slept at John's apartment.

49. All four had expected graduation dates of May 2022.

50. In 2020, John was involved in an accident involving a cigarette lighter that caused residual hand sanitizer on his hands to catch on fire, which also caused his clothes to catch on fire.

51. John was traumatized by this incident and had confided in Jane.

52. John lives off-campus in a high-rise apartment with a Chinese family that is not affiliated in any way with NU.

53. On September 25, 2021, John invited Jane Roe ("Jane") and their two friends, Diya and Ena, over to study at his apartment. The three women accepted John's invitation, and he picked them up and brought them to his apartment.

54. Jane began drinking alcohol when she arrived at John's apartment.

55. Shortly after, Jane took a cigarette lighter and ignited the flame near John's hair and face.

56. John asked Jane several times to stop putting the lighter near his face and hair because he was wearing hair gel that he believed to be highly flammable.

57. Jane ignored John's pleas and retorted, "why do I need to stop … [w]e're all educated people why would I do that?"

58. John feared that Jane was going to either light his apartment or hair on fire especially when she ignored his pleas to stop and when he felt the heat of the flame near his eye, which caused him to physically remove the lighter from Jane's hand.

59. In response, Jane threw away the rest of John's tobacco.

60. Jane, again, picked up the lighter, ignited the flame, and held it near John's face and hair. John pled with her to stop lighting the flame near his face. When his requests were unsuccessful, he physically attempted to remove the lighter from her hand.

61. Jane threw the lit butane lighter across the room causing John to panic and search for the lighter fearing that the apartment could have been set on fire.

62. Shortly thereafter, Jane called an Uber, and the three women left John's apartment.

**Plaintiff contacts NU's Counseling Services**

63. John was extremely distraught by the entire incident. He did not know what to do. He feared that he had ruined his life, friendships, and academic career.

64. NU's Counseling and Psychological Services (CAPS) serves as the primary mental health service for students at Northwestern University and provides counseling, crisis intervention, suicide prevention, grief counseling, consultation, and outreach services for NU's students.

65. On October 3, 2021, John sought counseling at CAPS and expressed how the incident was affecting his mental health.

66. CAPS never followed up with John after that initial visit despite its promises to do so.

## Person of Concern Report is Filed Nine (9) Days Later

**67.** The next day, and nine (9) days after the September 25th incident, NU Student Engagement

Coordinator, Ahmad Alony Hamed ("Hamed"), filed a "Person of Concern" Report with OCS

accusing John of physically assaulting Jane and calling her a "bitch" among other verbal insults.

**68.** Here, the complainant was <u>not</u> the alleged victim, but an NU employee who reported a

secondhand account of an off-campus misunderstanding presuming that John was the aggressor

after "personally seeing Jane upset."

**69.** Hamed's Report was procedurally deficient for several reasons:

**a)** Hamed did not personally witness any of the allegations, he allegedly observed "the

physical manifestation of Jane's response" to John's purported assault;

**b)** Hamed made the allegations against John without informing either John or Jane;

**c)** Hamed acknowledged that the incident occurred off-campus;

**d)** Hamed conceded that Jane did not want to pursue charges against John;

**e)** Hamed wrote "N/A" in response to the question "how urgent is this report";

**f)** Hamed left portions of the form blank; and

**g)** This report was filed the day after John went to see the campus therapist. On belief,

Hamed shares an office with the CAPS therapist.

**70.** Despite these deficiencies, NU characterized the interaction described in Hamed's report as a

physical assault based on Hamed's unsubstantiated, third-party report.

**71.** NU then performed a one-sided and biased investigation believing Hamed's claims against John.

**72.** Hamed's Report also put NU on notice that John expressed suicidal ideations when provided

John's text messages to Jane stating: "I started cutting myself since that night" … and "thought

about killing myself" and "took a bottle of melatonin hoping I could disappear when I sleep."

**73.** Despite being on notice of these claims, NU did nothing to investigate the veracity of John's text messages to determine if he was a threat to himself nor did NU take any remedial or supportive measures to provide referrals or resources for John to seek mental health treatment.

### NU's Discriminatory Administrative Decisions

**74.** After the incident, Jane did not press charges against John, nor did she want to pursue the matter.

**75.** Jane even told the investigators that "she did not ask for the case to be pursued further and that it caught her off guard when University staff stated that NU needed to initiate an investigation."

**76.** Though none of these circumstances were applicable here, on October 11, 2021, NU arbitrarily placed John on an immediate and interim suspension.

**77.** The interim suspension took effect immediately before NU even interviewed one witness.

**78.** The undated letter stated that John's conduct in September may have violated the Handbook provision entitled: "endangering self or others – any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself)." The letter never articulated how John's conduct may have violated the Handbook.

**79.** The interim suspension had an immediate and catastrophic effect on John because he was:

    **a)** Dropped from all his courses (in-person or remote);

    **b)** Barred from visiting friends on campus or in NU housing;

    **c)** Barred from conducting research or publishing work associated with NU;

    **d)** Removed from his two teaching assistant positions;

    **e)** Removed from his research assistant position; and

    **f)** Barred from entering the Qatar Foundation.

80. Worse yet, John was unable to return to his home country because of Covid-19 restrictions so he was trapped in Qatar, could not attend classes (even remotely), or visit his friends at the Qatar Foundation or on campus.

81. If John lived on campus, he would have been immediately kicked out of his dorm and homeless.

82. The barring order also meant that John would be treated like a criminal. John's name was placed on a list of individuals barred from NU that was circulated to police and all campus buildings. The other individuals on the list are barred due to disciplinary charges such as sexual assault, destruction of property, theft, etc. Many of the individuals who staff the desks at dorms and NU buildings are NU students. These NU students were informed of John's barring.

83. Contrary to the Handbook, NU never contacted any outside law enforcement agencies even though John purportedly posed an imminent "threat to himself or others;" NU never conducted an individualized threat assessment to see whether John presented a threat to himself or others, and NU never provided John the ability to appeal the interim suspension.

84. John was never informed about or offered "supportive measures," which are non-disciplinary, non-punitive individualized services designed to restore or preserve equal access to NU's Education Programs or Activities without unreasonably burdening the other party, including measures designed to protect the safety of all parties or NU's educational environment, or deter physical assault. Such measures include modifications of work or class schedules, campus escort services, mutual contact restrictions, counseling, extensions, or other course-related adjustments.

85. NU based its interim suspension on both John's mental health struggles and his gender.

**The Discriminatory Investigation by the Office of Community Standards**

86. On October 20, 2021, Plaintiff was required to meet with two OCS investigators, Heather Cohen and Ron Alexander, to present his version of events.

87. Demonstrating a presumption of guilt against Plaintiff, Cohen claimed the meeting was meant to be an "educational and developmental experience" for John and it was "not to get anyone into trouble," which was misleading if not completely false.

88. Cohen claimed that even though Jane did not want to pursue charges against him, NU was pursuing the matter because Jane "was having a physical reaction to the incident."

89. When John informed Cohen that Jane was spreading rumors about the incident causing him continued reputational harm and distress, Cohen dismissed the impact it was having on his reputation by stating that the "gag order" only applied to him because NU "doesn't have a policy preventing people from sharing their story."

90. Cohen made it clear that she controlled the investigation including what information she subjectively believed to be relevant.

91. Cohen told John that he could file a report if he thought that Jane's behavior was violating an NU policy and that she would "be happy" to consider witnesses that had "valuable information" to its investigation.

92. Cohen urged John to read NU's retaliation policy and warned him "to be careful" about threatening legal proceedings against Jane because that would be retaliating against Jane, which "would affect his place at NU."

### NU's Investigation was Procedurally Inadequate

93. According to NU, OCS fosters individual and community development through thoughtful engagement with its policies, expectations, and standards.

94. In reality, NU's disciplinary procedures are a hodgepodge of overlapping and confusing procedures, which wholly fail to give students like John a clear understanding of what their rights are, and what standards, policies, and procedures will be applied to their cases.

95. NU never conducted a thorough, competent, or fair investigation that John was entitled to and the disciplinary process was replete with procedural errors that deprived Plaintiff of his rights to a fair process.

96. Research shows that in American schools, international students have a higher probability of being accused of wrongdoing, especially on an academic level.

97. The lack of clearly communicated policies and procedures left John to his own devices to try to understand his rights and which procedures will be applied.

98. NU's investigation suffered from several procedural irregularities where NU deviated from its stated Handbook policies and procedures including:

    **a)** Failing to conduct an individualized, objective assessment of whether John was a threat to himself or others; failing to obtain reasonable medical judgment or relying on medical knowledge or best available objective (nonmedical) evidence; failing to determine whether reasonable modifications of policies, practices, or procedures would have sufficiently mitigated any risk before placing him on an interim suspension; failing to provide referrals to mental health professionals; not contacting law enforcement or exploring containment strategies if John constituted such an immediate threat;

    **b)** Providing an atypical hearing, which was conducted via Zoom, at 7:00 p.m. [2] ARABIA by English-speaking investigators located in Evanston, Illinois), which was especially intimidating because NU does not permit students to have an attorney represent them throughout the disciplinary process;

---

[2] 11:00 a.m. CDT

**c)** Never explaining the disciplinary process even though John comes from a country that employs a different type of legal system;

**d)** Never offering John a translator knowing that English is not his first language;

**e)** Improperly shifting the burden of proof onto John to prove his innocence, rather than requiring NU to prove his guilt.

**f)** Accepting the statements of subjective, hearsay witnesses as credible and ignored evidence tending to exculpate Plaintiff, all while demonstrating an inherent prejudice against male students suffering from mental disabilities.

**g)** Failing to properly identify all the witnesses that were interviewed and failing to interview vital witnesses such as Hamed (the Reporter).

**h)** Mischaracterizing or downplaying the seriousness of Jane's actions by claiming that she was merely "playing around" with the lighter while overemphasizing that John's actions placed Jane in a "chokehold."

**i)** Ignoring NU's two-investigator model for students who may be separated from NU by allowing Cohen to be the only investigator to interview Jane and then accepting her one-sided credibility determinations in rendering its disciplinary sanction.

99. Not only was Cohen given complete discretion to determine how to conduct Jane's interview, but she also was the only one who heard Jane's responses, judged her demeanor, decided what information was necessary and relevant to include in the investigative report, selectively asked questions and presented the facts that she deemed relevant, and offered a subjective assessment as to the evidence and credibility of the parties.

100. The hearing officer does not conduct her own investigation or interviews, but instead relies entirely on the Report prepared investigators, and is unlikely to question or disturb the

findings of a colleague. As such, NU's policies lacked the requisite level of checks and balances to ensure the administration of an objective investigation and adjudication.

101.    John's Evanston-based advisor urged him "not fight the charges" because if he did not fight the charges, he likely would not be suspended. The advisor's statement that John had little chance of success fighting the charges was untrue, and she knew or should have known that her statement was untrue. The advisor's statement was misleading and displayed indifference to John's rights.

102.    Tellingly, and on belief, NU never investigated Jane's conduct even though she admitted to putting a lighter flame close to John's face and hair, and conceded that he asked her to stop, she continued ignoring the fact that Jane's conduct qualifies as assault.

## Northwestern's Discriminatory Final Investigative Report

103.    On November 16, 2021, OCS issued its preliminary investigative report for the September Incident purportedly relying on the Handbook, witness interviews, and "other supporting documentation."

104.    Defendant's investigators wholly discounted evidence tending to support Plaintiff's version of events and presumed he was guilty from the outset.

105.    A fair reading of the evidence relied upon reveals that NU's investigation lacked any corroboration or reliability:

   a)   John articulated he wished for Jane to stop playing with the lighter after the first time she picked it up and lit it.

   b)   John used force in getting Jane to put down the lighter.

16

   **c)**  Jane experienced symptoms consistent with a panic attack, including the inability to control her physical reactions, difficulty breathing, sustained crying, and deciding to see the school nurse, contacting the school counselor, and calling an ambulance.

   **d)**  John acknowledged in the texts that while he did not intend to hurt Jane, his actions went too far, and did result in such.

   **e)**  after John removed the lighter from Jane's hand the first time, Jane dumped out John's tobacco,

   **f)**  Jane picked up the lighter again, and held it up to John's face again,

   **g)**  Jane's behavior triggered John's fear of being lit on fire from his 2020 accident, and

   **h)**  John did not intend to choke Jane, rather than what occurred when he reached for the lighter, causing Jane to exhibit symptoms consistent with a panic attack.

**106.**   NU Code defines violence as a "behavior that causes harm to a person or causes fear for one's safety or the safety of others" and includes "physical contact that is harmful and **expression of intent** to cause physical harm." (emphasis added).

**107.**   Even though NU determined that John "did not intend to choke Jane," it somehow still determined that his conduct was unjustified.

**108.**   NU's Decision lacked the requisite detailed factual findings to support the Decision, including how the evidence in the Report was used and weighted to reach their conclusion.

**109.**   In pursuing an investigation against Plaintiff, Cohen and Alexander failed to consider Jane's motivation for insinuating to Hamed that something improper may have occurred. Namely, recognizing the potential consequences of being disciplined for repeatedly waving a lit lighter in John's facial area despite his repeated requests to stop.

**110.**     Nonetheless, NU pursued an investigation calculated to lead to the foregone conclusion that Plaintiff was responsible for the misconduct alleged.

**111.**     Had Cohen and Alexander conducted a thorough and impartial investigation, they would have concluded that while a hearsay witness presented one version of the events, Jane's actions caused John to react in justified self-defense.

### NU Suspends John for the Spring 2022 Semester

**112.**     On January 5, 2022, the UHAS Sanctioning Panel met and suspended John for the Spring 2022 semester.

**113.**     The UHAS' sanctioning rationale purportedly relied on OCS' final investigative report, John's statements, and responses to questions during the Sanctioning Panel, his disciplinary history, and sanctioning precedent associated with prior cases involving individuals who were found responsible for engaging in similar conduct, Handbook sanctioning factors, and any other aggravating, mitigating, or relevant factors.

**114.**     The only physical contact between John and Jane occurred when he physically removed the lighter from Jane's hands twice after she repeatedly ignored his requests to stop lighting the lighter near his face and hair.

**115.**     Defendant considered John's behavior to be "a serious breach of our community expectations" because he purportedly "engaged in two consecutive instances of physical force towards another student which ultimately resulted in the student experiencing symptoms consistent with a panic attack that later required intervention by NU's psychologist that same day."

**116.**     NU conceded that John "did not intend to cause harm and acted in response to concerns for personal safety."

117.  Physically removing a lighter from another student is not sufficient to constitute a disciplinary infraction if John acted in self-defense.

118.  The Panel never specifies why John's act of self-defense was "not justified," or what were the "several alternative responses" that John could have done instead.

119.  Instead, NU penalized him for asserting that he acted in self-defense by stating that "[he] seemed to minimize [his] behavior and failed to appreciate the long-term impact of [his] actions, specifically, in questioning the legitimacy of Jane's response."

120.  In particular, NU analyzed the persistence and severity of the incident and determined:

    a)  That the first instance was not persistent or severe "based on the short-lived nature and quick recovery of the first incident."

    b)  That the second interaction with the lighter was not "itself persistent," but the "use of force was persistent."

    c)  That John's actions "rose to the level of severity required by the Handbook" because "the women left immediately" after the incident, John's repeated apologies, and Jane's physical reactions.

121.  Despite John's "physical space limitation present as well as some of the personal triggers [he] experienced from past trauma, the panel did not find that these justified [his] actions and weighed that still there were several alternative responses available, which John had reflected on and identified during the panel."

122.  The panel determined that the Incident had a "significant impact" on Jane because of her claims that she became "socially more reserved with people … walking through campus became a bit difficult because I knew he was still around … she needed her friends to escort her because she was afraid of a confrontation."

**123.** John's suspension meant that he was barred from registering for classes, submitting course work, receiving academic credit, attending class (even remotely), remaining in NU housing, including Qatar Foundation housing, utilizing any University services, or participating in any function or event sponsored by NU or any of its departments, groups, or organizations (unless specifically authorized). John was also barred from receiving NU credit for academic work pursued at any other institution during the period of suspension.

**124.** John's suspension will permanently appear on his record in the Office of the Vice President for Student Affairs (but not on John's transcript).

**125.** John's return was also conditioned on "educational interventions" consisting of:

    **a)** Watching two YouTube videos, a Ted-Talk entitled "The power of vulnerability" and another video entitled, "Learning to Manage Anger with Accountability." John was required to reflect on what he learned from each video and that connects to his actions in the September 25th matter;

    **b)** Meeting with Dr. Saed Hill, who is NU's Assistant Director of Prevention and Masculine Engagement at the Center for Awareness, Response, and Education (CARE); develops and implements strategies to improve masculine engagement in the prevention of violence and serves as a confidential survivor advocate.

    **c)** Signing a release permitting the Office of Community Standards to share the Findings/Analysis section of the final report (pgs. 9-14) with Dr. Hill.

    **d)** Writing a Petition to Return essay with John's reflections on the incident, and the impact that his behavior created; what he did while away from NU; what he learned about himself, his behaviors, and his role in a community; the specific behavioral changes he made, demonstrate a concrete plan for returning to NU; and estimated

graduation date and his plans for moving successfully toward graduation while avoiding future conduct concerns.

    **e)** Getting approval from Dr. Hill and Christine Depilla.

126. Recognizing the damaging impacts and difficulties that suspensions have on students, Depilla even offered to meet with him because she "understand[s] re-entering campus after being away can be difficult and wanted to share [she is] open to meeting or connecting when [he] return[s] to NU … [she] offer[s] this to all students coming back from a suspension and some find it helpful to have a resource as they navigate their return to campus."

### NU Failed to Investigate John's Claims for Discrimination

127. On April 16, 2022, Plaintiff Emailed Karen Tamburro, NU's Senior Director of Equal Opportunity and Access, and requested a meeting based on the race and gender discrimination he encountered.

128. Tamburro replied that she would connect Plaintiff to a US-based attorney from Franzcek P.C., which is "a law firm that [NU] contracted with due to volume and resources internally" and that he would be "following [NU's] policy and process used by the Office of Equity."

129. In response, Plaintiff hired an attorney to communicate with NU.

130. On April 22, 2022, Tamburro replied to Plaintiff that she received the communication from his attorney and that "attorneys are not permitted to serve as advisors in our process.

131. On belief, Plaintiff's claim of discrimination was not investigated further.

### COUNT I VIOLATION OF TITLE IX 1972, 20 U.S.C. § 1681, ET SEQ.
### (Erroneous Outcome)

132. John incorporates by reference each of the above paragraphs as if fully set forth herein.

**133.** Title IX prohibits discrimination based on sex in education programs and activities receiving federal financial assistance. 20 U.S.C. § 1681, et seq.; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005).

**134.** Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder.

**135.** The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "[accord] due process to both parties involved..."

**136.** Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

**137.** NU is a recipient of federal funds and is bound by Title IX and its regulations. For example, NU received over $12,775,920 in federal funds in connection with CoVid-19 emergency relief.

**138.** NU applied its stated policies and procedures in a manner that discriminated against John based on sex and led to an erroneous and adverse outcome.

**139.** Several facts cast doubt on the accuracy of NU's outcome. Specifically:

    **a)** NU investigator's failure to consider that Jane admitted to waving a lit lighter around John's facial area and that he had asked her repeatedly to stop, the corroborating witness testimony establishing the same, her motivation to not be disciplined for her role in the incident, their failure to question Hamed, and their failure to identify to John the witnesses against him before completing the investigation, and the failure to set a formal hearing for testimony and presentation of other evidence.

**b)** Failure to consider John's actions were justified self-defense.

**c)** Defendant commenced an investigation and required John to provide a statement concerning his version of the events before notifying him of the exact nature of the allegations against him.

**d)** Defendant improperly placed the burden of proof on Plaintiff, as respondent, to disprove statements made by a third-party witness, which had no independent validity.

**e)** Defendant disregarded evidence tending to exculpate Plaintiff, including that Jane was lighting an ignited lighter in his face and that he lacked intent to choke Jane.

**f)** Defendant deprived Plaintiff of the right to a formal hearing before a panel of impartial decision-makers, denied him the opportunity to confront and question his accuser; and denied him the ability to challenge all witnesses against him.

**g)** Defendant failed to provide Plaintiff any rationale for its Decision, usurping any meaningful opportunity to appeal as he was not informed of the basis for its findings.

**h)** Defendant failed to investigate Jane's role in this incident and if John acted in self-defense.

**140.** NU discriminated against John and deprived him of the benefits of its education program based on sex through its discriminatory, gender-biased Code and Title IX policies and procedures governing physical assault proceedings, which intentionally subject male students like John to "less favorable" treatment than their female accusers.

**141.** NU was required to conduct an impartial and unbiased investigation process when evaluating an allegation of misconduct against Plaintiff.

142.  NU treats female complainants differently than male respondents based on its outdated attitudes about females and overbroad generalizations and stereotypes about male and female traits and behaviors.

143.  Several facts establish that NU's decision was motivated by gender bias:

   a)  Although ostensibly framed in gender-neutral terms, the Code's policies and procedures are based on unfair, overbroad generalizations, and antiquated gender-biased traits and behaviors that male students are perceived as aggressors and perpetrators, and female students are perceived as victims and survivors.

   b)  NU's investigatory process presumes the veracity of female complainants' reports of assault and shifts the burden on the male students they have accused to prove their innocence. NU claims to adhere to a "feminist approach to sexual violence, relationship violence, and stalking. The survivor's needs and rights are the first priority of CARE and guide the planning and decision-making of CARE staff."

   c)  The NU Men and Masculinities Center literature presumes that men (but not women) will engage in "unhealthy and risky behaviors" including "relationship violence."

   d)  NU's Code provisions have been deliberately designed to favor the female accuser and disadvantage the accused male by eliminating from the process fundamental procedural safeguards for the accused outlined in Title IX regulations, such as the right to an adequate, reliable, and impartial investigation, the right to present evidence and witnesses, and the right to fair notice of its procedures.

   e)  NU continues to use "gag orders," which runs afoul of the 2017 Department of Education's significant interim guidance prohibiting "gag orders" because they are

"likely to deprive the parties of the ability to obtain and present evidence or otherwise defend their interests ..."

144.    Given the complete lack of due process safeguards, it is effectively impossible for an accused student like John to meet the unfair and constitutionally impermissible burden of proving his innocence.

145.    As a direct result of its discriminatory practices, John was denied a fundamentally fair hearing based on sex, the Board reached an erroneous outcome, and John has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff, John Doe prays that this Court enters judgment in his favor, awarding him damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career opportunities, and loss of future career prospects, loss of his scholarship, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### COUNT II VIOLATION OF TITLE IX 1972, 20 U.S.C. § 1681, ET SEQ.
### (Deliberate Indifference)

146.    John incorporates by reference each of the above paragraphs as if fully set forth herein.

147.    A private right of action under Title IX also encompasses intentional sex discrimination in the form of a recipient's deliberate indifference *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290–291, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

148.    NU selectively enforces the Code and Title IX policies by treating John as a male student accused of physical assault less favorably than it would treat a similarly situated female student, who would not be subjected to the same disciplinary proceedings, which are

premised on the gender-biased notion that males are invariably perpetrators and females are invariably victims of "physical violence."

149.    NU had actual notice of the irresponsible, improper, and gender-biased way that the allegations against John were investigated and adjudicated, yet it did nothing to remedy it.

150.    As a direct result of Defendant's deliberate indifference, John has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff, John Doe prays that this Court enters judgment in his favor, awarding him damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career opportunities, and loss of future career prospects, loss of his scholarship, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III – DUE PROCESS VIOLATIONS

151.    John incorporates by reference each of the above paragraphs as if fully set forth herein.

152.    It is well-established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

153.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

154.    Plaintiff also has a constitutionally protected property interest in his continued enrollment at NU and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices, and understandings established by NU.

155.    Plaintiff's constitutionally protected property and liberty interests arise from the express and implied contractual relationship between NU and Plaintiff.

156.    Defendant deprived John of his liberty and property interests without affording him basic due process, including, but not limited to:

    **a)** failing to conduct a thorough and impartial investigation compromising John's rights to a fair adjudication, be informed of the exact charges against him, be heard by an impartial factfinder, to question his accuser, to challenge the credibility of adverse witnesses, and to present evidence and witnesses in support of his defense;

    **b)** subjecting John to an interim suspension that was unwarranted under Code or Handbook;

    **c)** failing to conduct an individualized assessment into whether John posed a direct threat to himself or others;

    **d)** conducting a one-sided investigation in favor of Jane's allegations when they excluded relevant and exculpatory evidence, afforded significant weight to witnesses lacking any independent knowledge of the events, and denied John his procedural rights, to fit within the narrative that he was guilty of the misconduct alleged.

    **e)** Failing to provide a formal or evidentiary hearing including the rights to (i) question Plaintiff's accuser; (ii) question the people that the Investigators had interviewed, and (iii) present evidence and witnesses in support of John's defense;

    **f)** Lacking fact-findings and reasoning in the Decision,

    **g)** Not even following the low threshold of a preponderance of the evidence standard.

157.    Defendants further denied Plaintiff of his rights to due process when they deprived him of any meaningful opportunity to appeal either the interim suspension or disciplinary sanction. The failure to set forth a detailed factual finding in a NU's disciplinary determination is a substantial failure of due process, as it forecloses the accused student's ability to effectively

challenge the determination in administrative appeals and the courts and to ensure the decision was based on the evidence in the record.

158.    Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations, in this case, resulted in a sanction that will have lifelong ramifications for Plaintiff, and are quasi-criminal.

159.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. He lost his scholarship because of NU's disciplinary finding. His lifelong goal of becoming an attorney has been shattered.

160.    NU is liable for violating his due process rights and for the damages arising therefrom.

161.    As a direct and proximate result of the above conduct, John sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, career opportunities, economic injuries, and other direct and consequential damages.

WHEREFORE, Plaintiff, John Doe prays that this Court enters judgment in his favor, awarding him damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career opportunities, and loss of future career prospects, loss of his scholarship, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV – VIOLATION OF AMERICANS WITH DISABILITY ACT

162.    John incorporates by reference each of the above paragraphs as if fully set forth herein.

163.     Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(b)(1)(A)(i)-(ii); 28 C.F.R. § 36.202(a)-(b).

164.     Title III further provides that an individual or entity shall not utilize standards or methods of administration that screen out, tend to screen out, or have the effect of discriminating based on disability such that persons with disabilities cannot fully and equally enjoy any goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C § 12182(b)(1)(D(i) and § 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

165.     Title III further states that a public accommodation may impose legitimate safety requirements that are necessary for safe operation, but those safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities. 28 C.F.R. § 36.301(b).

166.     According to Title III, discrimination includes the failure of public accommodation to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

167.     NU, as an undergraduate and postgraduate educational institution, is a "place of public accommodation" as set forth in Title III of the ADA. 42 U.S.C. § 12181(7)(J).

168.     John's disability substantially limits the major life activities of learning, concentrating, and thinking as reflected by his suicidal ideations, and is protected by the ADA. *See* 42 U.S.C. § 12102(2)(A); *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2d Cir.

2003)( "A mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself.").

169.    Mental-health conditions like depression or suicidal ideations constitute a disability. *See, e.g., Harvard v. Inch*, 411 F. Supp. 3d 1220, 1240 (N.D. Fla. 2019); 28 C.F.R. § 36.105(d)(2)(iii)(K) ("Major depressive disorder . . . substantially limits brain function.").

170.    As for John's academic success, "the [disability] definition is met even if the difficulties are not insurmountable." *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998).

171.    An individual may "achieve some measure of success despite his disability." Peters v. Univ. of Cincinnati Coll. of Med., No. 1:10-CV-906, 2012 WL 3878601, at *6 (S.D. Ohio Sept. 6, 2012) (rejecting the notion that "academic success" precludes a finding of disability, which "flies in the face" of the 2008 ADA amendments); Bartlett v. N.Y. State Bd. of Law Examiners, No. 93 CIV. 4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001) (rejecting reliance on outcomes alone, since disabled individuals may be "extremely bright and hardworking" and "use[] alternative routes to achieve academic success").

172.    John has a record of his disability and NU knew about his disability. § 12102(B)(C).

173.    Interim restrictions are imposed to ensure equal access to educational programs and activities and protect the complainant as necessary.

174.    NU suspended John on an interim basis based on limited information and without speaking to or observing John or any other witnesses such that NU could not have possibly formed a reasonable belief that John was a threat to himself or others.

175.    During this time, John was not allowed to participate in his classes or on-campus events, either in person or remotely.

176. Even though John is a full-time student at NU, Defendant placed him on interim suspension, which completely barred him from campus, and his return was conditioned on a satisfactory evaluation and his agreement to provide his medical records to the school.

177. NU excluded him from participation and denied him the benefit of its programs, services, and activities when it placed him on interim suspension and barred him from campus until the conclusion of his disciplinary proceedings (denying him access to facilities and recreational activities) from October 11, 2021, to the end of Spring 2022 semester. *See Cragg v. Dist. Bd. of Trs. of Miami-Dade Coll.*, No. 17-20300, 2018 WL 8334585, at *7 (S.D. Fla. Nov. 30, 2018) (Temporary and conditional removal from campus activities can constitute an exclusion of educational benefits).

178. John's interim suspension was based on NU's purported "zero-tolerance" policy, which John's due-process rights because NU conducted no independent consideration of the relevant facts and circumstances surrounding the allegations in his case.

179. Defendant, however, never even attempted to show that the interim restrictions placed on John were necessary to protect the complainant or to ensure him equal access to educational programs and activities.

180. Disregarded John's need for mental health intervention.

181. The student conduct process at NU is cumulative and progressive. John has not been the subject of any NU disciplinary proceedings other than this matter.

182. NU failed to develop policies to respond appropriately to students with mental illnesses and instead took actions based on inaccurate stereotypes of persons with mental illness.

183. On belief, when suspending non-disabled students, NU does not enforce interim suspensions in the same way the interim suspension was enforced against John. For example,

Defendants do not bar non-disabled students from campus until hearings are convened or further condition their return upon behavioral interventions overseen by NU-selected professors and the sharing of private medical information with NU administrators.

184.     The method by which NU deployed deprived John of the rights, privileges, advantages, and opportunities enjoyed by other students, was not based on actual risks, and was instead based on mere speculation, stereotypes, or generalizations about individuals with disabilities and thus had the effect of discriminating against him in violation of Title III of the ADA.

185.     Defendant failed to investigate John's suicidal ideations or mental health struggles even though it was on notice from both Hamed's report including text messages and John's meeting with the school psychologist.

186.     As a proximate result of NU's ADA violations, John has been injured as set forth herein.

187.     NU's conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, NU will continue to violate the ADA and inflict injuries for which there is no adequate remedy at law.

WHEREFORE, Plaintiff, John Doe prays that this Court enters judgment in his favor, awarding him damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career opportunities, and loss of future career prospects, loss of his scholarship, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT V: VIOLATIONS OF § 504 OF THE REHABILITATION ACT

188.     John incorporates by reference each of the above paragraphs as if fully set forth herein.

**189.** § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely because of him or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

**190.** Regulations implementing §504 promulgated by the Department of Education ("EDU regulations") provide that recipients of federal financial assistance, in providing any aid, benefit, or service, may not, based on disability, discriminate against a qualified person with a disability by denying them an opportunity to participate in or benefit from that aid, benefit, or service. Nor may such recipients of federal financial assistance provide an unequal, different, or separate benefit to such qualified persons. 34 C.F.R. § 104.4(b)(1).

**191.** EDU regulations provide that no qualified student with a disability shall based on disability, be excluded from participation in, be denied the benefits of, or otherwise be subject to discrimination under any academic, research, housing, health insurance, counseling, financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid, benefits, or services. 34 C.F.R. §§ 104.43(a), 104.43(c), 104.52(a)(1).

**192.** John is a qualified NU student with a disability within the meaning of §504.

**193.** As an admitted student, John was and is qualified to participate in NU's services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

**194.** As an educational institution that permits students to pay education-related costs with the assistance of federal grants and loans, and receives federal funding, NU's operations are qualified programs or activities under § 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i)-(h), 104.41.

195.   NU knew of John's disability based on him attending a counseling session with an NU counselor, his text message communications with Jane, and based on his representations to the NU Investigators throughout the disciplinary proceedings.

196.   NU violated §504 by denying John the benefits of its programs, services, and activities based on his disability.

197.   NU's exclusion of John from campus and conditioning of John's ability to fully and equally enjoy his status as a student at NU's choosing and waive his right to medical privacy is a criterion or method of administration that has the effect of substantially impairing John's accomplishment of his academic program objectives and is in violation of Section 504.

198.   NU's use of policies and practices that utilize criteria and methods of administration that have the effect of discriminating against students with disabilities, including John, by making it more onerous for them to access NU's goods, services, facilities, privileges, advantages, and accommodations violates §504.

199.   As a proximate result of NU's violations, John has been injured as set forth herein.

WHEREFORE, Plaintiff, John Doe prays that this Court enters judgment in his favor, awarding him damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career opportunities, and loss of future career prospects, loss of his scholarship, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VI: DECLARATORY JUDGMENT

200.   John incorporates by reference each of the above paragraphs as if fully set forth herein.

201.   NU committed numerous violations of its contract with John and federal law.

202.    John's educational career has been severely damaged.

203.    Without appropriate redress, the unfair outcome of the hearing and decision will continue to irreparably harm John especially as he begins to apply to law school.

204.    If this incident does not completely preclude John from being accepted into any law school, then he will face difficulty in sitting for the bar as this will be a major blemish on his character and fitness application.

205.    As a result of the foregoing, a justiciable controversy between the parties exists concerning the outcome, permanency, and future handling of John's student record.

206.    John requests under 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Defendant about John be reversed; (ii) John's disciplinary record be expunged; (iii) the record of John's suspension be removed; (iv) any record of John's disciplinary hearings be permanently sealed or destroyed; and (v) Defendant's rules, regulations, and guidelines are unlawful as applied.

## **PRAYER FOR RELIEF**

WHEREFORE, John respectfully requests that this Court:

A.    Conduct a mediated settlement conference or refer the case to its court-annexed mediation program to assist the parties to bring about a settlement of this case;

B.    Order Defendant to expunge any notation of any charges, interim suspensions or restrictions, findings, and/or sanctions from his transcript, education record, and disciplinary record to the extent that any such notation exists;

C.    Issue a Declaration under 28 U.S.C. § 2201 that by engaging in the foregoing actions, NU has willfully, recklessly, or with callous indifference violated and continues to

violate John's due process rights under the law and that NU engaged in gender

discrimination in violation of Title IX; and

**D.** Award compensatory damages against NU for recklessly or intentionally violating

Title IX and for ongoing egregious violations with no sign of relenting.

**207.** Plaintiff requests a trial by jury on all issues so triable.

Respectfully Submitted,
John Doe

By:_____
Gianna Scatchell, one of Plaintiff's
Attorneys

Dated: July 28, 2022

Gianna Scatchell, Esq.
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 330
F: (312) 846-6363
E: gia@dispartilaw.com