**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case No. 22-cv-03934 |
| | ) |
| NORTHWESTERN UNIVERSITY, | ) Honorable Elaine E. Bucklo |
| | ) |
|     Defendant. | ) |

**DOE'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, John Doe, through his undersigned counsel, respectfully submits this Response in Opposition to Defendant's Motion to Dismiss pursuant to 12(b)(6) (Dkt. 30). For the reasons stated herein, Defendant's motion should be denied.

**I.    BACKGROUND**

Plaintiff, John Doe is a Chinese national. FAC ¶ Defendant Northwestern University ("NU") is a major research and teaching university located in Evanston, Illinois. *Id.* at ¶ . Northwestern extended its institution to Qatar. *Id.* at ¶ Doe is a student at NU's Qatar campus. *Id.* at ¶

NU maintains a website dedicated to its Qatar campus. *Id.* at ¶ On its Qatar website, NU students can access various NU policies including its policies on student discipline, discrimination, and accommodations, student disciplinary process, and student support services. *Id.* at ¶ NU operates and controls its Qatar disciplinary proceedings from its Evanston campus. *Id.* at ¶¶ 16-17, Ex. 1. NU's policies and procedures outline certain prohibited conduct. *Id.* at ¶¶ 18-19. Any student accused of violating any of NU's policies are guaranteed certain procedural protections during disciplinary proceedings. *Id.* at ¶¶ 20 – 24.

1

Northwestern's Policy on Institutional Equity "is committed to fostering an environment in which **all members of our community** are safe, secure, and free from sexual misconduct of any form. NU specifically acknowledges its intent to be bound by both the ADA and Rehabilitation Act, including for its Qatar-based student body:

> The rights of students with disabilities at the university level in the United States of America are protected under § 504 of the Vocational Rehabilitation Act of 1973 (§ 504), the Americans with Disabilities Act of 1990, and the ADA Amendments Act of 2008.[1]

The NU Qatar website also confirms that "students with disabilities" registered with Accessible NU-Q have the following rights: "Equal access to courses and programs offered through the University Equal opportunity to learn, and to receive reasonable accommodations and academic adjustments in an effort to diminish the effect of the condition on academic functioning."[2] Further, NU alleges that its Office of Equity is:

> committed to making our services accessible to all members of the Northwestern community. The Office is cognizant of the physical accessibility of our space, the cultural competency of our staff, and the method and tone of the services we provide. Accessibility includes but is not limited to: providing reasonable accommodations to persons with disabilities, including mental health concerns, ensuring our online resources are accessible, providing translation services, and providing competent, respectful, and trauma informed service to people of all identities and expressions.[3]

John and NU entered into a contractual agreement where John paid (through his scholarship) NU, and in exchange, NU would provide educational services, support, opportunities, and other related services. FAC ¶¶ The terms of the contractual agreement were set forth in NU's publications including its Student Handbook, Title IX policy, ADA and FRA policies, among other

---

[1] https://my.qatar.northwestern.edu/academic-resources/academic-advising/accessiblenu-q/laws.html

[2] https://my.qatar.northwestern.edu/academic-resources/academic-advising/accessiblenu-q/rights-responsibilities.html

[3] https://www.northwestern.edu/equity/policies-procedures/policies/policy-on-institutional-equity.pdf

NU policies. The Handbook details the policies, procedures, and expectations expected of the students.

Following an altercation where John physically removed a lighter from Jane's hand in self-defense, a third party filed a complaint against John. Jane did not wish to pursue a claim against John and was "blindsided" by NU's actions to pursue the matter without her consent. FAC ¶¶ NU suspended Doe on an interim emergency basis because he was a threat to himself and others. Id. at ¶¶ . Despite Doe's explicit statements about self-harm and depression, NU did not offer him any counseling or other remedial services. Plaintiff was denied supportive measures, which are non-disciplinary, non-punitive, individualized services offered as appropriate, as reasonably available, and without fee or charge to the Respondent before or after the initiation of an investigation, or where no investigation has been initiated. NU designs such measures "to restore or preserve equal access to NU's education programs or activities without unreasonably burdening the other party, including measures designed to protect the safety of all parties or NU's educational environment, or deter discrimination, harassment and/or sexual misconduct including counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services…"; FAC ¶¶. Following the disposition of the disciplinary proceedings, NU suspended for an additional semester. Id. at ¶ . Every aspect of NU's investigation occurred on its Evanston campus. Id. at ¶ . In providing Supportive Measures, the Office of Equity will make every effort to avoid depriving **any student** of their education or access to the University's program or activities. NU further promises that emergency removals only occur after an "individualized safety and risk analysis determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations justifies removal."[4]

---

[4] https://www.northwestern.edu/equity/documents/2020policy-on-institutional-equity.pdf

This lawsuit relates primarily to disciplinary proceedings against Plaintiff in 2021. Specifically, this case seeks to redress the breaches of NU's promises to: (a) to provide equal access to its education and services to all students, even those that are disabled, (b) to provide certain procedural guarantees in the student disciplinary process and access to certain programs for disabled students, and (c) to not discriminate against any student based on gender, national origin, disability, or other protected class, and (d) the breaches of these promises.

## II. STANDARD OF REVIEW

To survive a motion to dismiss, the complaint must contain sufficient facts which, if accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although evaluating the plausibility of a legal claim "requires the reviewing court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, the court may not disregard properly pled factual allegations even if "it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556. Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits—"a well-pleaded complaint may proceed even if . . . 'a recovery is very remote and unlikely.'" *Id.* (citations omitted). The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint. Courts have also held that a high degree of factual specificity is not required at the pleading stage. *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 517 (2016). At this stage, the Plaintiff's complaint, together with the referenced documents, satisfies this Court's notice-pleading requirements and sets forth sufficient facts to show a plausible claim for relief.

## III. ARGUMENT

Defendant argues that Plaintiff's ADA, FRA, and Title IX claims (Counts I-IV) should be dismissed because Congress has not evinced its intent to have these statutes apply extraterritorially. Defendant is mistaken as outlined below. Courts utilize well-established canons of statutory construction to resolve questions of extraterritoriality. Where the statutory language is ambiguous as to extraterritoriality, courts apply the presumption against extraterritoriality, which has become the dominant canon of construction. This canon interprets the absence of express extraterritoriality as an indication that Congress only intended the statute to apply domestically. S. Nathan Williams, *The Sometimes "Craven Watchdog*: *The Disparate Criminal-Civil Application of the Presumption Against Extraterritoriality*, 63 DUKE L.J. 1381, 1382 (2014).

The Supreme Court in *Morrison* introduced a two-part extraterritoriality test: (1) whether Congress intended the federal law to apply extraterritorially and (2) whether the specific facts could be characterized as extraterritorial. 561 U.S. at 266–67, 267 n.9. When tackling the first part, the Supreme Court reaffirmed the presumption against extraterritoriality. *Id.* at 255 (internal citations omitted). Moving to the second part, the Court analyzed whether the specific facts could be characterized as domestic, and thus not extraterritorial, occurrences. If so, the presumption against extraterritoriality is moot.

**A. Title III of the ADA (Count I) and Rehabilitation Act (Count II)**

Defendant argues that the ADA and FRA do not apply to Plaintiff because he is not a US citizen. A prima facie case of discrimination under the ADA requires a plaintiff to show: "(1) that he suffers from a disability as defined in the [ADA], (2) that he is qualified to participate in the program in question, and (3) that he was either excluded from participating in or denied the benefit of that program based on his disability." *Novak v. Bd. of Trs.*, 777 F.3d 966, 974 (7th Cir. 2015). Defendant does not dispute that Plaintiff is disabled because of his anziety. "To prove disability

5

discrimination, a plaintiff must show that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *CTL v. Ashland Sch. Dist.*, 743 F.3d 524, 528-29 (7th Cir. 2014) (internal citations and quotations omitted). The ADA provides the foundation to understanding disability within a nondiscrimination civil rights framework. It defines an individual with a disability as "a person who has a physical or mental impairment that substantially limits major life activities; has a record of such an impairment; or is regarded as having such an impairment." This means that both people with "impairments" and people "perceived" as such are considered disabled and are protected by the ADA, even without a formal diagnosis.

Section 504 of the Rehabilitation Act ("§ 504" or "FRA") and Title III of the Americans with Disabilities Act ("ADA") and their implementing regulations apply in the higher education context and prohibit discrimination on the basis of disability against otherwise qualified individuals with disabilities. § 504 prohibits discrimination against individuals with disabilities in connection with programs and activities that receive federal financial assistance (and thus applies to almost all colleges and universities) and Title III applies to various categories of private providers of public accommodations – including private colleges and universities. § 504 and the ADA protect only individuals who (1) qualify as an individual with a disability under the applicable statutory definitions and (2) are "otherwise qualified" for the programs in question. [8] With regard to the first requirement, the ADA defines an individual with a disability as one who has "a physical or mental impairment that substantially limits one or more major life activities . . . a record of such an impairment; . . . or [is] regarded as having such an impairment." [9] § 504 uses the same definition. [10]

Very few federal courts have examined the applicability of federal disability discrimination laws to study abroad programs, but at least two opinions signal that courts may find extraterritorial application. In *Bird v. Lewis & Clark College* and *Tecza v. University of San Francisco* both deal with a Plaintiff who alleged discrimination as prohibited under the ADA and § 504 while participating in an education abroad program.

In Bird v. Lewis & Clark, Plaintiff Bird was an American undergraduate student who required substantial accommodations for a physical disability that required her to rely on a wheelchair for mobility. Bird participated in a Lewis & Clark College program in Australia taught by American faculty from the institution. While the college made several significant accommodations to the program, there were some parts of the program that were not accessible due to the nature of the student's disability and the curricular nature of the program. When a field trip was not able to be made accessible to the student, such as a tour exploring tidal pools or a hike that included multiple stream crossings, the institution arranged alternate activities. The student brought a suit against *Lewis & Clark College* alleging nine separate causes of action, including violation of § 504 and Title III of the ADA. The district court addressed the extraterritoriality issue in its ruling, emphasizing that Bird was an American student, participating in an American institution's study abroad program taught by American faculty. Given the close involvement of the American institution, the district court found the presumption against extraterritorial application should not apply. Additionally, the court warned that if § 504 and the ADA did not apply to study abroad programs then students would be at risk of discrimination with no recourse.

Similarly, NU is a domestic university, its administrative decisions for its Qatar campus occur domestically at its Evanston office, and NU's Qatar campus is owned by a domestic entity. Defendant's reliance on *Galligan* is misplaced. In *Galligan*, the Court held that Plaintiff failed to

7

state a claim under the FRA or ADA because this FRA allegations—that the program, exclusion, denial, and discrimination all took place in St. Kitts and Nevis and that the alleged discrimination, lack of equal enjoyment, and public accommodations under Title III were all in St. Kitts and Nevis. *Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356, at *3 (N.D. Ill. Feb. 4, 2019). Unlike the Plaintiff in *Galligan*, John states that NU's discrimination, biased investigation, and discrimination all occurred in Evanston, Illinois. The administrators that made all of the decisions throughout Plaintiff's disciplinary process were all located at the Evanston campus.

      Courts have applied both the ADA and the FRA to non-US citizens in a variety of contexts. First, Title I of the ADA was amended to extend protection to U.S. corporations operating overseas (ADA, 2008). Courts have found certain non-US citizens constitute a particular type of social group for purposes of asylum. See, e.g. *Tchoukhrova v. Gonzales* (holding that "Russian disabled children and their parents" constitute a particular social group for the purpose of asylum). The Court held that a non-US citizen seeking asylum, Ricardo de Santiago-Carillo belonged to a particular social group of people with "serious mental illness." The BIA noted that abusive practices and treatment within these institutions could amount to persecution, especially given the recognition by the U.N. Committee on the Rights of Persons with Disabilities and others that institutionalization often leads to isolation and higher risk of violence.

      Defendants' reliance on Straw v. U.S. Dept. of State, Guess v. St. Martius Univ., and Archut v. Ross Univ. School Of Veterinary Med are not convincing since NU concedes that each case was decided at the summary judgment stage.

      In *Torrico v. International Business Machines Corporation*, an individual employed by IBM on a temporary assignment in Chile was terminated while on medical leave and subsequently sued IBM pursuant to the ADA.13 The court concluded he stated a valid ADA claim

8

notwithstanding his lack of U.S. citizenship, and despite the ADA's statutory definition of "employee" as "an individual who is a citizen of the United States." The issue in Torrico was whether the extraterritorial provision of the ADA allowed this foreign national to state a claim upon which relief could be granted pursuant to the ADA. Torrico, 213 F. Supp. 2d at 404. The court held that the issue of extraterritoriality was actually not implicated because Torrico's overseas assignment constituted "employment in the United States" under the court's "center of gravity test," thus bringing his discrimination allegations within the domestic, rather than extraterritorial, reach of the ADA. Id. at 404.

Plaintiff's allegations that NU suspended him on an interim basis without following its behavioral threat assessment protocol, made disciplinary decisions based on an inadequate and biased investigation, rejected Plaintiff's pleas for mental health counseling, and knew about Plaintiff's harm to himself by referencing his "cutting" are all sufficient to raise the plausible inference that NU knew that a harm to a federally protected right was substantially likely and failed to act upon that likelihood. *Doe v. McHenry Cnty. Coll.*, No. 17 CV 4247, 2020 WL 5209834, at *4 (N.D. Ill. Sept. 1, 2020).

### A. Plaintiff's Title IX Claim Should Not Be Dismissed for Lacking Statutory Standing Under Title IX

Defendant moves to dismiss Counts III and IV because (1) Title IX does not apply extraterritorially to Qatar. NU's argument fails because John is not requesting application of Title IX extraterritorially, but instead seeks its application to NU's business conduct in the US.

Title IX, codified under 20 U.S.C. § 1681, states "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Title IX prohibits discrimination based on sex by public and private educational institutions who

are recipients of federal funds. Institutions whose students receive federal financial aid funds are considered recipients thus including most postsecondary institutions in the United States. Title IX is administered by the Office of Civil Rights (OCR) of the United States Department of Education ("DOE"). Every such institution must have a Title IX coordinator whose responsibilities include maintaining institutional efforts to comply with Title IX, to oversee all complaints of sex discrimination, and to identify and address any patterns of noncompliant behavior. Title IX prohibits discrimination on the basis of sex for individuals participating in federally funded educational programs and provides protections against sexual harassment or sexual discrimination. Pursuant to the Department of Education's 2020 regulations implementing Title IX, NU adopted an Interim Policy on Title IX Sexual Harassment, which governs certain instances of sexual misconduct. FAC ¶¶. The University applies its interim policy to "all members of the NU community – students, faculty, and staff, as well as University vendors, contractors, visitors, guests, volunteers, interns, and third parties."[5] Id. at ¶ .

In the educational context, the majority of the caselaw interpreting the extraterritoriality of federal laws appears in cases involving schools and study abroad programs. For example, a district court ruled that Title IX protects students who participate in study abroad programs through American universities. *King v. Bd. of Control of E. Mich. Univ.*, 221 F. Supp. 2d 783, 790–91 (E.D. Mich. 2002) (because study abroad programs have become an integral part of college education, equality of opportunity in study abroad programs is "unquestionably mandated by Title IX" and requires extraterritorial application of Title IX); *but see Phillips v. St. George's Univ.*, No. 07-CV-1555, 2007 WL 3407728, at *5 (E.D.N.Y. 2007) (Title IX does not apply where the

---

[5] https://www.northwestern.edu/equity/documents/2020policy-on-institutional-equity.pdf

plaintiff was attending a school in Grenada and alleged that she was harassed by a school employee in Grenada and that the school employees ignored her complaints in Grenada).

Defendant claims that the phrase "[n]o person in the United States" should control the interpretation of the statute, triggering the canon against extraterritorial application which the Supreme Court emphasized in Morrison. While the Department makes much ado about the canon against extraterritorial application, other principles of statutory interpretation may require a different result. For instance, he Supreme Court has also indicated that statutes must be read as a whole and interpreted such to avoid absurd results. Moreover, the Supreme Court has stated that remedial statutes should be interpreted broadly to effectuate their purposes. In particular, §1681(a) reads in full: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." The Department's interpretation reads out the term "any" whenever an educational program or activity takes a student outside of the bounds of the United States. However, this interpretation conflicts with the Department's definition of "education program or activity" applied in other portions of § 106, which includes "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs." As the *King* court noted, "study abroad programs are operations of the University which are explicitly covered by Title IX and which necessarily require students to leave U.S. territory in order to pursue their education."

If the literal reading of the words "no person in the United States" of Title IX is accepted, then students participating in education abroad programs would be significantly exempted from Title IX protections. In contrast, a broad reading of Title IX includes education abroad programs

11

supported by §§ 1681 and 1687 ensuring every educational program should be afforded protection against discrimination under Title IX. See *King v. Board of Control of Eastern Michigan University* (2002). While Defendant merely focuses on the fact that Doe is not a US-citizen, he is participating in an educational program in the US. *King* illustrates that Title IX takes within its scope every single university education program, including NU's Qatar Campus. Moreover, NU's handbook and policies support Doe's claim that Title IX protections extend to all of its students at all of its campuses.

Plaintiff, by contrast, contends that the statutory language in Title IX, specifically "any education program or activity" and "all of the operations" is sufficient to imply the extraterritorial application of Title IX in this case. Specific exemptions in Title IX do not include an exemption for US-owned universities operating in a foreign country and handling its disciplinary functions domestically. In addition, Title IX is remedial legislation which typically exists to avoid the use of federal resources in support of discriminatory practices and to provide individual citizens protection against discriminatory practices. Case law supports a broad application of remedial statues in order to apply the statues overarching purpose. *Gebser v. Lago Vista Independent School District* (1998); *Grove City College v. Bell* (1983)). The use of the word "any" is meant to be most comprehensive in application as established by Niece v. Fitzner (1996). In the specific case of Title IX, the court found the legislative history made clear that "all" was meant to be read comprehensively and no implied exceptions to statutory protections exist.

This Court must disregard Defendant's attempt to argue the factual record that Plaintiff is attempting to avoid dismissal by baldly asserting that the Evanston office made all the decisions. As John's FAC asserts, NU's specific Title IX policies are conflicting because some claim that Title IX applies to its Qatar students, while other policies claim that it is NU's interim Title IX

policy applies. But, despite the inconsistent approach, NU has never claimed that its students were not protected from gender discrimination and the protections of Title IX. Instead, NU claims that Title IX applies to its entire community. Further buttressing the notion that NU intends to be bound by Title IX are the NU-Q student protests over inadequate Title IX protections and the NU's acknowledgment of the protests and issues related to Title IX in Qatar. FAC ¶¶ . NU's Provost, Holloway, publicly stated additional evidence illustrating that it is the Evanston office that makes the administrative decisions regarding Title IX and federal protections by stating that he "will commit to addressing Title IX claims at the Office of Equity in Evanston."[6]

      Lastly, this Court must deny Defendant's Motion to Dismiss Coutns III and IV because *Kiobel v. Royal Dutch Petroleum* is also valuable to determine Title IX's jurisdictional reach. At issue in *Kiobel* was "whether and under what circumstances" ATS applies extraterritorially to "violations of the law of nations" occurring outside the United States. Unlike *Kiobel*, the bulk of the relevant conduct that gave rise to the lawsuit, the interim suspension, the investigation, and resulting disciplinary disposition all occurred in the United States at NU's Evanston campus. NU's domestic campus organized and operated the programs and sent employees abroad with students. The only conduct that occurred outside of the United States was the incident between Jane and John Doe.

### B. Plaintiff has Pled the Existence of a Contract (Count V)

      Plaintiff alleges that she had a contractual relationship with NU embodied in the Student Handbook and other policies, and NU breached this contract by discriminating against him based and his disability and gender, and not providing him a reasonable accommodation. Under Illinois

---

[6] https://dailynorthwestern.com/2019/11/03/campus/nu-q-students-and-alumni-stage-silent-protest-dean-responds-after-to-hell-with-them-comment/

law, the elements of a breach-of-contract claim are: (1) the existence of a valid and enforceable contractual promise; (2) a breach of that promise; (3) plaintiff's performance; and (4) resultant damages. *Dual-Temp of Illinois, Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016).

In Illinois, the legal relationship between a student and university is contractual, with the contract terms generally set forth in the school's catalogs and manuals. As this Court noted, "[i]n Illinois, 'a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins.' " *Doe v. McHenry Cnty. Coll.*, No. 17 CV 4247, 2020 WL 5209834, at *5 (N.D. Ill. Sept. 1, 2020)(internal citations omitted); *Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356, at *7 (N.D. Ill. Feb. 4, 2019) (denying motion to dismiss breach of contract claim based on student handbook). Specific promises in the course catalog, bulletins, and other university publications become part of the contract. *See, e.g., Lozier v. Quincy Univ. Corp.*, No. 3:18-CV-3077, 2019 WL 409368, at *6-7 (CD. Ill. Jan. 31, 2019) (declining to dismiss breach of contract claim where university alleged breached terms in its handbook and "bulletins, circulars, and online website information and regulations"). The university's publications are terms of an "implied-in-fact contract" rather than an express contract and "custom and usages can also become specific terms by implication." *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992).

The crux of NU's motion is that the FAC does not identify a specific contractual provision that establishes that it had an obligation to provide to provide the procedural guarantees and services that John alleged throughout his FAC. In the case at bar, John satisfies FRCP 8 by sufficiently pleading every element of a breach of contract claim. Plaintiff alleges that he had a contractual relationship with NU-Q embodied in the Student Handbook, and NU breached the Student Handbook by discriminating against him and failing to follow its own procedural

14

protections, its policies, and its handbook. FAC ¶¶ In particular, John pled (a) he was promised certain procedural protections related to any disciplinary proceedings, promised certain counseling services FAC ¶¶, (b) he paid tuition in exchange for that education *Id.* at ¶¶, (c) the services for which he paid were not provided FAC ¶¶, (d) Plaintiff suffered actual losses and damages as a result of NU's breach of contract. More specifically, throughout the FAC, Plaintiff alleges the applicable portions of NU's publications that advise the procedural protections promised to John which implied that he was entitled to an education and support services free from discrimination based on disability or gender and that he would have certain procedural guarantees in any disciplinary matter or interim suspension. FAC ¶¶ . NU's materials touted its many resources and programs for equality and inclusion—the majority of which are located at the Evanston campus. These allegations are sufficient at this early stage, especially because Illinois law recognizes that the college/student contract is typically implied in the college's publications. These concrete, specific allegations establish the existence of a valid contractual promise for in-person instruction and access to facilities and resources, and allege all that is required under Rule 8(a)(2).

Illinois courts have found a valid contract based on far less than Plaintiff alleged under Rule 8(a)(2). For example, in *Galligan*, the court determined that a student handbook's statement that the defendant "[wa]s committed to ensuring that qualified students with disabilities are afforded reasonable accommodations... [wa]s definite enough [to be] a concrete promise" and create a contract. 2019 WL 423356, at *6-7. Even the plaintiff's "less specific[] but still plausibl[e]" allegations about academic probation and anti-retaliation terms in the handbook were sufficient to survive the university's motion to dismiss. Id. at *7. Likewise, in *Cairone v. McHenry Cty. Coll.*, No. 17-CV-4247, 2019 WL 3766112, at *9 (N.D. Ill. Aug. 9, 2019), the defendants moved for dismissal of the plaintiff's breach of contract claim because "other than referencing her

15

claimed right to the 'peaceful pursuit of education' and 'the reasonable use of College services and facilities,' Plaintiff fail[ed] to cite to any specific contractual promise that the College failed to honor." *Id.* The court disagreed, finding that the allegations that "the College failed to honor certain procedural rights contained in the [Student Code of Conduct]" were sufficient to state a breach of contract. Id. at *9-10.

Accordingly, John need only allege promises NU made in its course catalog, student handbook, and other publications that were part of the contract between Plaintiff and NU to survive a motion to dismiss. That Plaintiff sufficiently does. At this stage of litigation—given that Illinois law recognizes that the college/student contract may be implied in the college's publications—Plaintiff's factual allegations are sufficient to plead the existence of a valid contract for education, events, facility access, and resources under Rule 8(a)(2). Plaintiff's non-US citizenship does not relieve NU of its duty to provide specific, promised, and paid-for services, such as the procedural protections guaranteed to a respondent.

E. **Negligent Infliction of Emotional Distress (Count VI)**

To state a claim for negligent infliction of emotional distress ("NIED"), a plaintiff must show that "(1) defendant owed plaintiff a duty; (2) defendant breached that duty; and (3) plaintiff's injury was proximately caused by that breach." *Howell v. Jofe*, 483 F.Supp.2d 659, 667 (N.D.Ill.2007) (citations omitted). Whether a defendant owes a duty to the plaintiff is a question of law. Id. In determining whether defendant owed a duty to the plaintiff, Illinois courts consider "various policy considerations, such as the likelihood of harm, the gravity of the injury, the burden of guarding against the injury, and the relationship between the parties." Id. (internal citation omitted). "To recover damages for negligent infliction of emotional distress, a direct victim need not allege that he suffered physical manifestations from the emotional distress as a prerequisite to

16

recovery; emotional injuries stemming from the physical impact or injury alone will suffice." *Benton v. Little League Baseball, Inc.*, 181 N.E.3d 902 (Ill. App. 1st Dist. 2020). "Illinois courts treat claims by victims of negligent infliction of emotional distress under the same approach used for standard negligence claims." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009) (internal citations omitted). The only difference in distinguishing a claim for NEID is that the alleged injury may be solely emotional. *Dawson v. U.S.*, 316CV00827DRHSCW, 2017 WL 977822, at *5 (S.D. Ill. Mar. 14, 2017).

Under Illinois law, universities owe their students a duty "to use reasonable care to prevent injury." *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 54 (1983) (quoting *Carey v. New Yorker of Worcester, Inc.*, 355 Mass. 450, 452 (1969)). When viewing the facts of the FAC in the light most favorable to Doe, he alleges sufficient facts to support a claim that NU had a duty to protect him. *See Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 58 (1st Cir. 2011). That duty extends only to acts that are "reasonably foreseeable" to the university.

The complaint here alleges sufficient facts to support a claim that NU had a duty to protect John from self-harm. There is evidence in the investigatory report that John had previously requested NU's counseling services and that he indicated in the text message communications that he was "cutting himself" and had thoughts about self-harm. FAC ¶¶ John also alleged that his complaint to the equity and inclusion office was disregarded. Id. at ¶¶. His request for counseling services was denied. John's complaint of discrimination was met with a US-based law firm responding to his complaint and ultimately dismissing it without investigating the merits. At this early stage, viewing those facts in the light most favorable to John, the complaint plausibly alleges that it was reasonably foreseeable that John would be emotionally distraught by being suspended and banned from NU for nearly one year, he would be socially isolated, he was precluded from

17

returning to China because of the strict Covid-19 procedures, he lost his scholarship, was dropped from his classes, and lost his research and teaching positions, and was rejected NU's mental health counseling and supportive services. It is reasonable foreseeable that any student in John's position would have been emotionally distraught and could have easily began resorting to self-harm. Whether the facts as developed in discovery support such a claim is a question for another day. Accordingly, the motion to dismiss Count VI must be denied.

Defendant moves to dismiss Count VII by claiming that a declaratory judgment is a form of relief and not a cause of action. As explained below, Defendant's argument is unpersuasive and Plaintiff's Count VII should survive. The elements of a declaratory judgment action are " '(1) a plaintiff with a legal tangible interest; (2) a defendant having an opposing interest; and (3) an actual controversy between the parties concerning such interests.' " *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 26, 417 Ill.Dec. 693, 89 N.E.3d 341 (quoting *Beahringer v. Page*, 204 Ill. 2d 363, 372, 273 Ill.Dec. 784, 789 N.E.2d 1216 (2003)). A declaratory judgment allows the court, "in cases of actual controversy, [to] make binding declarations of rights, having the force of final judgments." 735 ILCS 5/2-701(a) (West 2020). "The elements of a declaratory judgment action are "(1) a plaintiff with a tangible, legal interest; (2) a defendant with an opposing interest; and (3) an actual controversy between the parties concerning such interests." *Adkins Energy, LLC v. Delta-T Corp.*, 347 Ill. App. 3d 373, 376, 282 Ill.Dec. 685, 806 N.E.2d 1273 (2004). A declaratory judgment action allows the court "to address a controversy one step sooner than normal after a dispute has arisen, but before steps are taken which would give rise to a claim for damages or other relief." *Eyman v. McDonough District Hospital*, 245 Ill. App. 3d 394, 396, 184 Ill.Dec. 502, 613 N.E.2d 819 (1993).

IV. **CONCLUSION**

WHEREFORE, the Plaintiff, John Doe respectfully request that this Honorable Court deny the Defendants' 12(b)(6) Motion to Dismiss, and for any other relief deemed just and proper. If the Court is inclined to grant Defendant's Motion in whole or part, the Plaintiffs pray for an opportunity to amend their Complaint.

Respectfully Submitted,

John Doe

Gianna Scatchell, Esq.

DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 330
F: (312) 846-6363
E: gia@dispartilaw.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing Complaint was filed on this Court's CM/ECF filing system on January 17, 2023, and that such counsels are all registered e-filers.

/s/ Gianna Scatchell

_____

One of Plaintiff's Attorneys